CLAY, Circuit Judge,
dissenting.
The district court in this case determined that “orders solicited” is an ambiguous phrase, even though-—based on plain meaning and common usage—it is not. The district court then construed this claimed ambiguity—even though there was none— against the incorrect party. And as if that was not enough, the district court, instead of attempting to divine the intent of the parties, based its interpretation of this phrase on testimony from a witness whose testimony was given far more weight than warranted by the circumstances. Any one of these errors is enough to reverse its decision. Taken together, it is obvious that the district court ignored well-settled contract principles and stacked one error upon another. I therefore dissent and would reverse the judgment below.[1]
I.
In arriving at its conclusion that “orders solicited” is an ambiguous phrase, the majority downplays or leaves out a few things along the way. Here is the full story.
Maverick , is a marketing company for automotive-related products and is owned solely by John Garrison. Worx is a manufacturer of an industrial-strength hand cleaner. Garrison was introduced to Worx when he met Brent Keeley, one of Worx’s vice presidents, at a trade show in 2006. Then, beginning in December 2006, Garrison started approaching Wal-Mart on Worx’s behalf, and actually had a meeting at Wal-Mart’s headquarters to market Worx’s hand cleaner.
On February 12, 2007, Maverick and Worx executed a marketing contract, under which Maverick acted as a sales representative for Worx. The contract, which was drafted by Worx, provided, in pertinent part:
*307 Agent’s Commissions. The commissions payable by Principal to Agent on orders solicited within or delivered to the Territory shall be 8% (“Commission Rate”). Commissions shall be deemed earned by Agent upon acceptance or delivery of the order by Principal, whichever occurs first.
R. 23-1, Marketing Agency Agreement, PagelD# 141 (emphasis in original).
The contract also provided that upon termination of the contract, Maverick would be entitled to payment for “orders solicited prior to the effective date of such termination, regardless of when such orders are accepted by Principal (provided Agent can demonstrate such orders were solicited prior to the effective date of such termination)[.]” Id. at 142 (parenthesis in original) (emphasis added).
From 2006 to 2009, Garrison, working through his company (Maverick), did a number of things to try to get Worx’s hand cleaner into Wal-Mart—he sent “somewhere over 500” emails, made at least eight trips to Bentonville, Arkansas (Wal-Mart’s headquarters), and put Worx’s product in several different distribution centers for testing. R. 114, Trial Transcript, PagelD# 3792-93. Throughout all this time, Garrison received no compensation from Worx.
On March 10, 2009, Sergio Abarca, another of Worx’s vice presidents, emailed Garrison to tell him that his marketing contract was being terminated effective July 10, 2009. On March 25, 2009, fifteen days after sending that email, Abarca negotiated a deal with Wal-Mart to carry Worx’s hand cleaner. Abarca announced on July 2, 2009 that Worx had reached a deal and signed a three-year contract with Wal-Mart to offer its hand cleaner in its stores. On July' 27, 2009, Wal-Mart assigned to Worx an item number. Worx received its first order from Wal-Mart on July 31, 2009—almost three weeks after Maverick’s termination went into effect.
Worx never paid a commission or fee to Garrison, and Garrison argued he was entitled to a commission because he solicited an offer from Wal-Mart prior to being terminated by Worx. This is what the dispute is all about.
II.
The district court ruled on summary judgment that the phrase “orders solicited” was ambiguous because, in the context of this case, that phrase is “of uncertain meaning and may be fairly understood in more ways than one.” R. 78, Summary Judgment Ruling, PagelD# 2889 (internal quotation marks and citation omitted), At the same time, though, the court recognized that the natural and ordinary meaning of the word “solicit” is “to petition to or to approach with a request or plea.” Id. (internal quotation marks omitted). Thus, the court said, “taking this meaning as determinative, the Court would have to rule, as a matter of law, for Maverick: no dispute exists that Maverick indeed petitioned Wal-Mart for business.” Id. Notwithstanding this statement, the court ordered the parties to trial on the meaning of the phrase “orders solicited.”
At trial, both parties offered testimony on the meaning of “orders solicited.” For his part,' Garrison testified that the word “solicited” meant “[tjrying to get the business.” R. 114 at 3771. Garrison, who said that he had been in the retail business since the 1970s, did not know of any other meaning of the word. He also testified that the word has no special meaning within the context of the retail industry. Keeley (one of Worx’s vice presidents) had a similar understanding of the word “solicited.” He explained his understanding in this way:
*308 Solicited, if someone went into a company and tried to get our product into there or if they had already [tried] to secure further orders, so basically knocking on doors and going and trying to get orders for our product. They were out soliciting orders, trying to find new business partners, end users or to resell and sell our product.
R. 113, Trial Transcript, PagelD# 3727.
Maverick also called an expert witness, Robert Muenz, who testified that “solicited” means “everything you do to try to get the business. I mean it can go from phone calls to e-mails to tests, to Power Point presentations, to appointments, to follow-up. It’s not anything specific. It’s just a general term that where we mean— the way we interpret it is that it’s everything that we have 'to do in order to get the business.” Id. at 3694. Like Garrison, Muenz testified that the word has no other special meaning.
Worx, on the other hand, presented the testimony of an expert, Tyrone Burroughs, who explained that in the context of dealing with Wal-Mart, the word “solicited” takes on another meaning: an order is not solicited until Wal-Mart gives the vendor (who in this ease is Worx) an item number and agrees On a price. Burroughs explained that getting a meeting with a Wal-Mart buyer and negotiating a price is just part of the process of developing a business relationship with Wal-Mart* and is pot considered soliciting an order from Wal-Mart.
The district court interpreted the meaning of “orders solicited” based on Burroughs’ testimony and made up the court’s own five-part test that concluded that an order is not solicited from Wal-Mart unless five things happen: (1) the vendor received a supplier agreement, (2) there was product testing, (3) Wal-Mart and the vendor agreed on a price, (4) Wal-Mart gives the vendor an item number, and (5) Wal-Mart places an order. The court found that the first three requirements were met, but because Wal-Mart did not give Worx an item number or place an order until after Maverick’s termination went into effect, Maverick had not solicited an order. The district court explained its ruling as follows:
“Soliciting an order” as used in the Agreement does not mean merely “trying to get the business.” Instead, the term means getting a specific request for the purchase of products which did not happen in this case until the standalone order was placed on July 31, 2009, after the expiration of the 120 day termination period.
R. 119, District Court’s Factual Findings, PagelD# 4264 (quotation marks in original).
III.
The district court erred because it interpreted the meaning of “orders solicited” based on testimony from Worx’s expert, rather than based on its natural and ordinary meaning. Under Tennessee law, ie., the governing law here, the goal of courts when interpreting contracts “is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.” Planters Gin Co. v. Fed. Compress & Warehouse Co., 7.8 S.W.3d 885, 889-90 (Tenn. 2002) (internal quotation marks and citation omitted). The court’s initial task in interpreting a contract is to determine whether its language is clear or ambiguous. Id. A contract is ambiguous if its meaning is uncertain and is “susceptible to more than one reasonable interpretation,” Id. at 890. If a court finds that a contract’s language is ambiguous, any ambiguity is to be strictly construed against the drafter, in this case *309 Worx. Hanover Ins. Co. v. Haney, 221 Tenn. 148, 425 S.W.2d 590, 592 (1968).
All of these principles—namely, that the words of a contract are to be given their natural and ordinary meaning and any ambiguity is construed against the drafter— are well settled; this is Contracts 101. The problem is that the district court did not follow these standards. Instead of giving the phrase “orders solicited” its ordinary meaning, the district court decided that the phrase was ambiguous and ordered a trial to try to figure out what it meant. Instead of construing this claimed ambiguity against Worx, the drafting party, the district court construed it against Maverick. And instead of trying to understand the intent of the parties, the district court relied on the testimony of a single expert witness—despite the testimony of all the other witnesses who testified to the contrary. All of this was error, and the district court’s decision should be reversed on that basis.
The contract does not define “orders solicited,” but that phrase is not ambiguous and should be given its ordinary meaning. Black’s Law Dictionary provides the following definitions for the word “solicitation:” (1) “[t]he act or an instance of 'requesting or seeking to obtain something; a request or petition,” and in the commercial context, (2) “[a]n attempt or effort to gain business.” Black’s Law Dictionary (10th ed. 2014). Merriam-Webster’s online dictionary defines “solicit” as “to ask for (something, such as money or help) from people, companies, etc.” http://www. merriam-webster.com/dictionary/soliciting (parenthesis in original). And the Oxford English dictionary tjefines “solicitation” as “[t]he action of soliciting, or seeking to obtain by earnest request; entreaty, petition, diligent or importunate asking.” OED Online, Oxford University Press, June 2016.
All of those definitions share a commonality: they describe someone asking for something—such, for example, as someone (like Garrison) 'asking a business (like Wal-Mart) to start carrying a new product (like Worx’s hand cleaner)—and this is exactly what the parties to the contract thought the phrase meant. Garrison explained at trial that he believed the word “solicited” meant “[t]rying to get the business,” R. 114 at 3771, and even Worx’s own vice president had a similar understanding of the phrase: “basically knocking on doors and going and trying to get orders for our product.” R. 113 at 3727. The only alternative explanation for what the word “solicited” meant came from Burroughs, Worx’s expert.
In reaching the conclusion that an order is solicited only after five steps are met— and, as a result, substituting the phrase “orders placed” for “orders solicited”—the district court disregarded the testimony of the parties as to their understanding of the phrase, which should have been of paramount importance in construing the parties’ intent. Instead, on a question of language, the district court relied on the testimony of a retail consultant, who we can fairly infer has no greater understanding or command of the English language than the actual parties to the agreement in question.
Moreover, even if the word “solicited” takes on another meaning when dealing with Wal-Mart—as Burroughs contended at trial—that is something that should have been put in the contract. Worx offered no evidence to suggest that Maverick had any idea it needed to satisfy some “five-part test”—which was entirely absent from the contract—in order to meet the contract standard of solicitation. And even if Garrison was an accomplished attorney—as the majority suggests he should have been (see Maj. Opn. at 7)—he never *310 would have accepted the contract or expended the energy that he did with an understanding that successfully pitching a product to Wal-Mart could be so readily ignored despite the delivery of a perfect strike. Nor would any experienced businessman undertake the effort Garrison took knowing the risks posed by the interpretation given by today’s majority.
The district court’s reading of the phrase “orders solicited” also violates a basic principle of Tennessee contract interpretation that contractual provisions are not to be read in isolation from the purpose of the contract. See Perkins v. Metro. Gov’t of Nashville, 380 S.W.3d 73, 85 (Tenn, 2012). The purpose of this contract was to give Maverick the opportunity to get in front of Wal-Mart—something that is not easy to do[2]—and pitch Worx’s product. And Maverick did exactly that. Maverick used its connections to get in the door at Wal-Mart; spent several years in regular contact with Wal-Mart’s buyers; made multiple trips to Wal-Mart’s headquarters in Arkansas; put Worx’s product in several different distribution centers for testing—and then was displaced at the eleventh hour, right before Worx received its first order from Wal-Mart. When one looks at this contract in the context of its objectives, it is obvious that the objectives here were accomplished. To underscore this latter point, one cannot help but notice the unseemly nature of the sequence of events. Imagine Garrison’s outrage when he eventually learned of the timing of his termination, which was followed almost immediately by successfully concluding the negotiations and a contract announcement, and then—only three weeks after Maverick’s termination went into effect—the placement of an order.
Finally, the issues in this case are relevant to several different marketing platforms. This same concept of midstream termination of a marketing contract arises in any number of other contexts, not just ones involving Wal-Mart. For example, this clearly arises in the context of real estate or other brokerage agreements, where the marketing efforts undertaken by a broker during the term of a listing frequently yield results after termination of a listing term. When considering our overall system of jurisprudence, we should not permit such an inequitable approach to commercial transactions become the law of the land. The district court’s opinion, and this Court’s affirmation, could now potentially be cited for any number of unjust violations of marketing or sales agreements.
IV.
The bottom line is that the district court erred when it determined that the contract was ambiguous, and the way it went about resolving that ambiguity was clearly erroneous. See Planters Gin, 78 S.W.3d at 889-90 (explaining that the issue of ambiguity is a legal question reviewed de novo, but its resolution of ambiguities is a factual question); Fed. R. Civ. P. 52(a)(6). Not only did the district court violate basic principles of contract law, it also held a trial where none was needed. Instead of holding a trial to determine the meaning of an unambiguous phrase—and then construing that phrase against the incorrect party—the district court should have read the contract for its ordinary and plain meaning, and against the backdrop of its purpose. If the court had any further doubt, then it should have held a trial on whether Wal-Mart placed an order as a result of Maverick’s efforts.
*311 What is more, the district court should not have allowed expert testimony to develop the meaning of an unambiguous phrase into a triable issue. Even worse, the district court made up its own “five-part test” for what constituted the solicitation of an order, and then used that fiction as its basis for deciding the case. None of the parties to the contract—not even Burroughs—testified that an order is deemed “solicited” only after five steps are met. This is something the district court came up with on its own, The result of this case is an injustice, crafted in the ivory tower of those not adequately exposed to real-life business norms.
For all these reasons, the district court’s decision should be reversed and remanded.

. I do, however, agree with the majority’s holding that the “MANA Code of Ethics” is not part of the contract, As the majority points out, the "MANA Code of Ethics" appears below the signature line, set-off from the rest of the contract, and uses aspirational, goal-oriented language in describing the relationship between Maverick and Worx. However, I part ways with the majority as to whether "orders solicited” is an ambiguous phrase, and also because the way in which the district court interpreted that phrase was clearly erroneous.

. Burroughs, Worx’s own expert, explained at trial that "depending on who you are, appointments [with Wal-Mart] sometimes can be difficult to get.” R. 113 at 3630.