DUNLOP TIRE & RUBBER CORPORATION, Dunlop Sports Company Division, Plaintiff-Appellee,

v.

SERVICE MERCHANDISE COMPANY, INC., Defendant-Appellant,

and

Temple Hills Country Club, Inc., Defendant.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Dec. 8, 1983.

Application for Permission to Appeal Denied by Supreme Court March 19, 1984.

Aaron Wyckoff, M. Edward Owens, Jr., Chambers, Wyckoff & Beckner, Nashville, for plaintiff-appellee.

Alfred H. Knight, Willis & Knight, Nashville, for defendant-appellant.

## OPINION

LEWIS, Judge.

Plaintiff Dunlop Tire and Rubber Corporation, Dunlop Sports Company Division (Dunlop) brought suit on an alleged contract of guaranty against defendant Service Merchandise Company, Inc. (Service Merchandise). The issues presented to the Chancellor and the issues presented in this Court are: (1) whether the parties entered into a guaranty agreement, and (2) if so, whether the agreement was supported by consideration. After a bench trial the Chancellor held there was a guaranty supported by consideration and entered a judgment of $167,503.92 for Dunlop against Service Merchandise.

## THE FACTS

Dunlop Sports Company Division is in the business of manufacturing and selling at wholesale sports equipment, including several different grades of golf balls. Service Merchandise is a large retail establishment which sells, through its showrooms and catalogs, brand-name goods, including sports equipment, at discount prices. For several years Dunlop had sold sports equipment to Service Merchandise and Bruce McDowell, a golf and tennis salesman for Dunlop, began dealing with Service Merchandise in 1972 and, in approximately 1975, began dealing with Stott Stevens, the senior buyer for Service Merchandise.

In early 1980, Stevens approached McDowell regarding whether Dunlop would be

willing to sell "Blue Max" golf balls to Service Merchandise. Service Merchandise wanted the balls packaged in 15-ball packs instead of in the usual packs of one dozen. Stevens wanted to promote the sale of the specially packaged golf balls as bonus packs, a marketing strategy that had worked well for Service Merchandise in the past. The "Blue Max" golf ball was advertised by Dunlop as "sold through professionals" and Dunlop would not sell the Blue Max directly to Service Merchandise. Dunlop agreed to sell the Blue Max to Service Merchandise, however, only by engaging in a so-called diverter transaction in which Dunlop ostensibly delivers and bills the purchased golf balls to a pro-shop with the understanding that they will actually be delivered to and paid for by the retail establishment. A diverter transaction was entered into by Dunlop, Service Merchandise, and Temple Hills Country Club in June, 1980, and gave rise to the present lawsuit.

In June of 1980, McDowell of Dunlop and Stevens of Service Merchandise entered into an oral agreement in which Dunlop agreed to sell and Service Merchandise agreed to purchase 18,750 of the 15-ball packages to be delivered in three shipments. Dunlop and Service Merchandise mutually agreed that the shipments and payments would be diverted through Temple Hills Country Club. Dunlop would ship and invoice the balls to Temple Hills with the understanding that they would actually be delivered to Service Merchandise. Temple Hills would invoice the balls to Service Merchandise and Service Merchandise would pay Temple Hills which would, in turn, pay the money to Dunlop. Temple Hills would receive up to four percent (4%) of the purchase price for its services in the transaction. It was understood that, although the documentation was to indicate that Temple Hills was purchasing the balls from Dunlop, Service Merchandise would actually receive and pay for them.

Diverter transactions such as the one involved in this case are common in the discount house business and are used in most departments at Service Merchandise in order to obtain goods from manufacturers who do not normally sell to discount houses.

While the record is not entirely clear concerning who selected Temple Hills Country Club as the diverter for the transaction involved in this case, it is clear that Stevens had employed Temple Hills as a diverter in a previous transaction with Dunlop. Stevens believed that Service Merchandise, or its President Raymond Zimmerman, had an ownership interest in Temple Hills and had passed this information along to McDowell. In fact, Raymond Zimmerman did own stock in Temple Hills and the President of Temple Hills, Roy Shainberg, was his cousin.

Service Merchandise placed three orders of 6,250 bonus packs. Each order was to be sent as a separate shipment. Tentative dates were set for the shipments. Service Merchandise was to call Dunlop when each particular shipment was desired. Both Dunlop and Service Merchandise understood that any shipment could be cancelled by either party at any time as was the custom in the trade. The price per shipment would be $54,250, although this price could be and was increased slightly to account for subsequent price increases. The first shipment was to be paid for before any subsequent shipments were made.

The first shipment was requested by Service Merchandise on June 20, 1980, and shipped on July 7th. The second shipment was requested on August 19, 1980. Dunlop still had not received payment for the first shipment, although Service Merchandise had, on August 4, 1980, paid Temple Hills the sum of $54,250.

Gerald Davern, Dunlop's credit manager, testified that he became concerned because Temple Hills had not forwarded payment for the first shipment. Before sending the second, Davern wanted a guaranty from Service Merchandise that Dunlop would in fact be paid for all past and future shipments of golf balls. Davern requested that McDowell obtain a guaranty and McDowell then communicated with Stevens. There is

conflict in the record as to whether McDowell actually requested a guaranty. In any event, after the conversation, Stevens wrote and hand delivered to McDowell the following letter (hereafter the letter):

August 22, 1980.

Mr. Gerry Davern
Dunlop Sports Company
P.O. Box 405
Buffalo, NY 14240

Dear Mr. Davern:

This letter is to advise you that Service Merchandise will be receiving products from Temple Hills C.C. and/or Al Womack on their Purchase Order Number 1027, 1028, and 1029. Service Merchandise will be responsible for these orders. I thank you for your consideration in this matter, and should you have any questions, please feel free to call.

Sincerely,
SERVICE MERCHANDISE COMPANY, INC.

[Signed]
Stott Stevens
Senior Buyer
Ext. 3006
SS:na

McDowell then called Davern, read the letter to him, and Davern authorized shipment of the second order on August 22, 1980. The third and final shipment was made on September 27, 1980. Service Merchandise received and paid Temple Hills for all three shipments.

Dunlop received no money from Temple Hills for any of the shipments. In order to ascertain the reason for the long delay in payment, McDowell visited Temple Hills Country Club and was finally able to obtain an interview with Temple Hills' President Roy Shainberg. Shainberg informed McDowell that Service Merchandise had indeed forwarded payment for the three shipments to Temple Hills but Temple Hills had spent the money to pay other debts instead of paying Dunlop.

McDowell testified that he had not anticipated that this would happen and he was surprised when he learned that Temple Hills had diverted the money for other purposes. McDowell called Stevens on five or six occasions attempting to enlist his aid in collecting from Temple Hills. He did not mention that Service Merchandise had guaranteed Temple Hills' payment or that Service Merchandise had any remaining obligation to Dunlop. After it appeared that Dunlop would not be able to reach a settlement with Temple Hills, Dunlop, through its corporate counsel, made demand upon Service Merchandise to pay pursuant to its guaranty.

## THE GUARANTY

Service Merchandise contends that the August 22nd letter is merely an acknowledgement of an existing oral agreement between the parties and in no way constitutes a guaranty; that the letter merely "advises" that Service Merchandise "will be receiving" the golf balls and that it "will be responsible for the orders;" that since the letter "does not use the word 'agree' or words of similar import" nor the word "guarantee nor any words indicating that Service Merchandise was incurring possible liability," it cannot be construed as a guaranty.

In support of this argument, Service Merchandise cites *Thompson Realty Co. v. Lawson* (Tenn.App. at Nashville, May 13, 1982), in which Lawson sought indemnification for attorney's fees and the cost of a bond incurred in defense of a lawsuit. Lawson owned certain real estate and had entered into an exclusive contract with Thompson Realty wherein Thompson was to act as Lawson's agent for the sale of the property. Harold Hitt had a client who wished to purchase the Lawson property. Lawson informed Hitt of his exclusive sales contract with Thompson. Hitt agreed that he would sell the property and split the sales commission with Thompson. Hitt sold the property but did not split the commission. Thompson then filed suit against Lawson, Hitt, and Hitt's employer. Lawson incurred attorney's fees in defending the suit and contended he was entitled to indemnification from Hitt because of a con-

versation he had with Hitt shortly after Thompson had filed the suit. Lawson testified that Hitt told him: "We'll take care of it. Don't worry about it." This Court, in reversing the trial court, found there was no consideration to support an indemnification agreement between the parties and further stated: "However, even if we assume that there is sufficient consideration and if we assume that Hitt, by stating, 'We'll take care of it,' meant that he and [his employer] would pay Thompson, we are unable to find any specific promise to pay attorney's fees and other costs incurred by Lawson." *Id.* at 3. *Thompson Realty* does not hold that Hitt's statement, "We'll take care of it," was too indefinite to support an agreement of indemnity for the payment of the sales commission. It only holds that no promise to indemnify for attorney's fees can be inferred from the statement, "We'll take care of it." *Thompson Realty* is inapposite to the instant case.

Service Merchandise also contends that the conversation which took place between Stevens and McDowell is consistent with its position that Stevens only understood that McDowell wanted written assurance that Service Merchandise would pay the invoices. There is support for this argument in Stevens' testimony. Stevens testified that McDowell "requested that Service Merchandise issue a letter written to Mr. Davern, Dunlop's credit manager, verifying the agreement that Service Merchandise would pay for the golf balls that were shipped from Temple Hills," that McDowell did not say anything to him to imply that he was asking Service Merchandise to modify its pre-existing agreement or to guarantee that Temple Hills would "pass Service Merchandise money on to Dunlop." On the other hand, McDowell testified concerning his conversation with Stevens:

"I told him that the credit department certainly had no problem with the credit stability of Service Merchandise Company, but we were very uneasy about Temple Hills Country Club and the fact that it was known that they were not financially sound.

"I told him that the credit department would like to have a letter of guaranty signed on their letterhead indicating that they would be responsible for the shipments to Temple Hills Country Club, and the three invoice numbers that they were covered under.

"I talked with him about the guaranty and he said he would be happy to provide us with one and I could pick it up."

■ While the Chancellor's finding that the letter "constitute[s] a guaranty of payment" is based at least in part on disputed oral evidence, such finding on appeal will be given great weight, *Town of Alamo v. Forcum-James Co.*, 205 Tenn. 478, 327 S.W.2d 47 (1959), since the Chancellor alone has the opportunity to observe the manner and demeanor of the witnesses while testifying.

■ This case is before this Court *de novo* upon the record accompanied by a presumption that the Chancellor's findings are correct unless the evidence preponderates against the findings. Tenn.R.App.P. 13(d). The burden is on the appellant to show that the evidence preponderates against the Chancellor's findings. *Capital City Bank v. Baker*, 59 Tenn.App. 477, 442 S.W.2d 259 (1969). Appellant Service Merchandise has failed to show that the evidence preponderates against the Chancellor's finding that "the letter does in fact constitute a guaranty of payment." The preponderance of the evidence is that the parties intended the letter as a guaranty for the payment of the three invoices.

### THE CONSIDERATION

Service Merchandise argues that even if the parties intended the letter to guarantee that Dunlop would receive payment for the golf balls, there was no consideration to support such an undertaking.

■ An alteration or amendment to an existing contract must be supported by consideration. *Boyd v. McCarty*, 142 Tenn. 670, 222 S.W. 528 (1919). Performing what was already promised in the original contract is not consideration to support

a second contract. *American Fruit Growers, Inc. v. Hawkinson*, 21 Tenn.App. 127, 106 S.W.2d 564 (1937). The modification of an existing agreement which imposes new obligations on one of the parties is unenforceable for lack of consideration unless it also imposes a new obligation on the other party. *See e.g.*, A. Corbin, *Corbin on Contracts* § 212 (1963).

■ Dunlop had agreed to ship in three shipments the golf balls and Service Merchandise had agreed to pay for each shipment. There was, therefore, an existing agreement between Dunlop and Service Merchandise and that agreement was later modified imposing a new obligation on Service Merchandise. However, both parties agree that Dunlop did not have an obligation to ship and Service Merchandise had no obligation to receive the second or third shipment. Either party could have cancelled the agreement at any time without incurring any liability.

Temple Hills Country Club was entitled to a four (4%) percent discount[1] if the first shipment was paid by August 10th. The fact that Temple Hills did not pay by August 10th to take advantage of the discount, coupled with the fact that Service Merchandise had ordered the second shipment, caused concern to Dunlop's credit manager. McDowell, after learning of this concern, asked the credit department what would be necessary to have the second shipment shipped. The credit manager instructed McDowell "to obtain, from Service Merchandise on their letterhead, a written guaranty that they would be responsible to Dunlop for the invoice and to specify the three invoice numbers on the guaranty." Thereafter, McDowell contacted Stevens and, after their conversation, McDowell was furnished with the letter.

Stevens testified regarding McDowell's request for the letter: "First, that it was unusual, and second, that it was almost a waste of my time, *but if that's what it took to get the deal done, fine.*" (Emphasis added.) Stevens acknowledged that Dunlop was under no obligation to make the second or third shipment and he recognized that it was necessary to write the letter acknowledging that Service Merchandise would be responsible for all three invoices if the "deal" was to be "done." Dunlop, in consideration of the letter of guaranty, made the second and third shipments.

Service Merchandise has failed to carry its appellate burden of showing that the evidence preponderates against the Chancellor's finding that there was consideration. *Capital City Bank v. Baker*, 59 Tenn.App. 477, 442 S.W.2d 259 (1969).

The judgment of the Chancellor is affirmed with costs assessed against Service Merchandise and the cause remanded to the Chancery Court for the collection of costs and any further necessary proceedings.

TODD, P.J. (M.S.), and CANTRELL, J., concur.

---

1. Temple Hills was to receive as compensation for acting as diverter four (4%) percent if the invoice was paid within thirty days of receipt of the golf balls, three (3%) percent if paid within sixty days, and two (2%) percent if paid within ninety days. If payment was received by Dunlop after ninety days then Temple Hills received no compensation.